# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DESKTOP METAL, INC., | ) |
| | ) |
| *Plaintiff and* | ) |
| *Counterclaim Defendant,* | ) |
| | ) |
| v. | ) |
| | ) **Civil Action No. 1:18-CV-10524-WGY** |
| MARKFORGED, INC. AND MATIU | ) |
| PARANGI, | ) |
| | ) |
| *Defendants and* | ) |
| *Counterclaim Plaintiff* | ) |
| *(Markforged, Inc.),* | ) |
| | ) |
| v. | ) |
| | ) |
| RICARDO FULOP, JONAH MYERBERG, | ) |
| BOSTON IMPACT LLC, and AMY BUNTEL, | ) |
| | ) |
| *Third-Party Defendants.* | ) |
| | ) |

## <u>DEFENDANT MARKFORGED INC.'S CLAIM CONSTRUCTION BRIEF</u>

# **TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................................. 1

II.     THE ASSERTED PATENTS ............................................................................................ 3

III.    ARGUMENT .................................................................................................................... 4

   A.   "Fabricating an Interface Layer" ........................................................................... 4

   B.   "Interface Layer" ................................................................................................... 8

   C.   "Sintering" .............................................................................................................. 9

   D.   "Resists Bonding" ............................................................................................... 11

   E.   "Support Structure" .............................................................................................. 13

   F.   "Object" / "First Object" / "Second Object" ...................................................... 14

   G.   "Mechanically Related To" ................................................................................. 16

   H.   "Structurally Independent From" ........................................................................ 19

IV.     Conclusion ..................................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Andrx Pharms, Inc.*,
  473 F. 3d 1196 (Fed. Cir. 2007) ..............................................................5

*Aquatic AV Inc. v. Magnadyne Corp.*,
  No. 14-cv-01931-WHA, 2015 WL 926425 (N.D. Cal. Feb. 25, 2015) ...................................12

*Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc.*,
  262 F.3d 1258 (Fed. Cir. 2001) ..................................................... 14, 15

*Edwards Lifesciences LLC v. Cook Inc.*,
  582 F.3d 1332 (Fed. Cir. 2009) ............................................................. 10

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*,
  815 F.3d 1314 (Fed. Cir. 2016) ............................................................. 2

*Halliburton Energy Services, Inc. v. M-I LLC*,
  514 F.3d 1244, 1256 (Fed. Cir. 2008) .......................................... 12, 20

*Hill-Rom Co. v. Kinetic Concepts, Inc.*,
  209 F.3d 1337 (Fed. Cir. 2000) ............................................................. 4

*Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*,
  493 F.3d 1358 (Fed. Cir. 2007) ............................................................. 8

*Infinity Headwear & Apparel, LLC v. Jay Franco & Sons, Inc.*,
  No. 15-CV-1259(JPO), 2016 WL 5372843 (S.D.N.Y. Sept. 26, 2016) ................................... 5

*Interval Licensing LLC v. AOL, Inc.*,
  766 F.3d 1364 (Fed. Cir. 2014) ........................................................... 11

*Jack Guttman Inc. v. Kopykake Enterprises, Inc.*,
  302 F.3d 1352 (Fed. Cir. 2002) ...................................................... 10, 11

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
  579 F.3d 1363 (Fed. Cir. 2009) ...................................................... 1, 5, 10

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014) ....................................................................... 3, 13

*Netword LLC v. Centraal Corp.*,
  242 F.3d 1347 (Fed. Cir. 2001) ....................................................... 1, 16

*Network Commerce, Inc. v. Microsoft Corp.*,
  422 F.3d 1353 (Fed. Cir. 2005) ........................................................... 15

*Nystrom v. TREX Co.*,
   339 F.3d 1347 (Fed. Cir. 2005) ........................................................................... 1

*Saffran v. Johnson & Johnson*,
   712 F.3d 549 (Fed. Cir. 2013) ...................................................................... 15, 18

*Southwall Techs., Inc. v. Cardinal IG Co.*,
   54 F.3d 1570 (Fed. Cir. 1995) ............................................................................. 6

*Trustees of Columbia Univ. v. Symantec*,
   811 F.3d 1359 (Fed. Cir. 2016) ......................................................................... 16

*In re Walter*,
   698 Fed. App'x 1022 (Fed. Cir. 2017) ............................................................. 11

## **Rules / Statutes**

35 U.S.C. § 112.......................................................................................................... 12

## <u>NOTES ON CITATION</u>

1. The patents-in-suit, U.S. Patent Nos.  9,815,118 and 9,833,839, are attached to the declaration of Patrick Curran dated June 19, 2018 ("the Curran Declaration") as Exhibits A and B, respectively.  References to the patents-in-suit are indicated by column and line number.  For example, reference to "'118 at 3:15" means column 3, line 15 of the '118 patent.

2. Other exhibits are attached to the Curran Declaration as Exhibits C through  N, and are referred to with the prefix "Ex. __."

3. The full text of the asserted claims is attached to this brief at Appendix A, with disputed terms listed in **bold**.

## I.     <u>INTRODUCTION</u>

Desktop Metal asserts two patents in this action, U.S. Patent Nos. 9,815,118 ("the '118 patent") and 9,833,839 ("the '839 patent") ("the asserted patents").  Both issued from related applications and deal with manufacturing methods, but, as discussed below, each patent describes and claims distinct inventions.[1]  Both patents have detailed intrinsic records that explain clearly what Desktop Metal actually invented and intended to envelop with its claims.  Some terms in the asserted claims do not require constructions.  But unsurprisingly, a number do.  Where constructions are required, Markforged proposes constructions taken directly from the detailed intrinsic records because that is the context in which the claims must be understood by one of ordinary skill in the art.  *See Netword LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001) ("The claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose.").  Only constructions tethered to the intrinsic record can assure that the jury will apply claims reflecting what the inventors actually invented and the property rights specifically granted by the Patent Office – not litigation-inspired constructions motivated by a desire to support assertions of infringement.

Certain claim terms are actually explicitly defined in the patents.  For example, "fabricating an interface layer" and "sintering" are defined explicitly in the specification; those definitions control.  *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009).  Other terms, like "mechanically related," "object," and "support structure," derive meanings entirely

---

[1] Desktop Metal filed at least 27 applications in this family, including at least 10 related applications on March 24, 2017 – the day Desktop Metal filed for the '118 and '839 patents.  Ex. C.  It therefore is unsurprising that the '118 and '839 patents each claim different subject matter.

from the context of the asserted patents, including repeated usage that implicitly defines the terms; those meanings also control. *Nystrom v. TREX Co.*, 339 F.3d 1347, 1350 (Fed. Cir. 2005).[2]

Desktop Metal takes a different approach. Its asserted patents are highly technical, long (68 columns), and extremely detailed, yet, oddly, Desktop Metal proposes no claim constructions whatsoever. It says every claim term has an "ordinary and customary meaning," without actually proposing any such meanings or pointing to the intrinsic record. Ex. D. That is an invitation for error. Claim construction begins with the ordinary meaning of terms; but that is not a construction in and of itself. When a term's construction is disputed (as a number of terms here are) the Court cannot simply instruct the jury to give the term its "ordinary" meaning. *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1319 (Fed. Cir. 2016) ("By determining only that the terms should be given their plain and ordinary meaning, the court left this question for the jury to decide. This was legal error." (citation omitted)).[3]

Desktop Metal seeks the flexibility to rewrite its patent claims during the course of trial by avoiding definitions set forth in its patents. For example, every claim in the '839 patent requires "fabricating an interface layer adjacent to the support structure." If Desktop Metal has its way, the Court would simply tell the jury to give that element (and every other element) its "ordinary and customary meaning." But the '839 patent clearly and explicitly defines that phrase in a way that Desktop Metal knows is not the "ordinary and customary meaning." It is not even clear there is any "ordinary meaning" for this defined term. The '839 patent states that "***as used herein***, references to 'fabricating an interface layer' are ***intended to refer to*** a step of fabricating a discrete

---

[2] Other terms, such as "resists bonding," defy any attempt at clarity, unless construed to provide objective boundaries, such as preventing bonding.

[3] Recognizing this problem, Desktop Metal's expert recently provided an expert report that simultaneously declares none of the terms require construction, yet then presents more than 30 pages of constructions. Ex. E.

layer of material between a support structure and an object that provides a non-sintering barrier between the two in subsequent processing." '839 at 44:12-17.  That definition controls – not Desktop Metal's desire to give the jury no guidance at all and hope for a finding of infringement.[4]

Desktop Metal's approach flies directly in the face of Federal Circuit precedent.  To meet their important notice function, patents must "be precise enough to afford clear notice of what is claimed, thereby 'appris[ing] the public of what is still open to them.'" *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014).  Claim construction is key to providing that clarity.  Much as good fences make good neighbors, clear patents make good competitors.  "Ordinary and customary meaning" of the sort proposed by Desktop Metal does little to define the metes and bounds of Desktop Metal's patents.  Markforged respectfully asks the Court to adopt its proposed constructions over Desktop Metal's purposefully vague use of "ordinary and customary meaning."

## II.  THE ASSERTED PATENTS

Desktop Metal tries to conflate the two asserted patents even though they plainly are directed to different technologies.   In fact, Desktop Metal's proposed constructions and infringement contentions make little distinction between the two patents.  But the patents are different, as the intrinsic record readily shows.  The '118 patent describes and claims inventions directed to creating "mechanically-related" parts, such as gears and hinges.  *See, e.g.*, '118 at 2:2–3.  The '839 patent describes and claims inventions relating to creating parts that, due to their geometry, require creation of a "support structure."[5]  *See, e.g.*, '839 at 1:32.

---

[4] Desktop Metal's expert offers an equally unacceptable alternative:  breaking the defined term "fabricating an interface layer" into (1) a dictionary definition for "fabricating" and (2) a non-definition for "interface layer."

[5] A "support structure" is used in 3D printing to support a portion of an object that could not be created without a support – for example, a portion of an object that overhangs the layers below it.  Figure 3 shows a support structure, 313, that provides support for the portion of the object that would otherwise fall to the build plate because of the pull of gravity.

This distinction is plain at the outset from the titles and abstracts of the patents.[6]  The '118

patent is entitled "Fabricating Multi-Part Assemblies" and the '118 patent abstract states:

> Techniques are disclosed for fabricating multi-part assemblies.  In particular, by forming
> release layers between features such as bearings or gear teeth, complex mechanical
> assemblies can be fabricated in a single additive manufacturing process.

'118, Abstract.  In contrast, the '839 patent is entitled "Fabricating An Interface Layer For

Removable Support," and its abstract states:

> Support structures are used in certain additive fabrication processes to permit fabrication
> of a greater range of object geometries.  For additive fabrication processes with materials
> that are subsequently sintered into a final part, an interface layer is fabricated between the
> object and support in order to inhibit bonding between adjacent surfaces of the support
> structure and the object during sintering.

'839, Abstract.  The distinction between these patents carries over into their claims.  (The full text

of the asserted claims are reproduced in Appendix A.)  Every claim of the '118 patent requires

fabrication of a "first object" and a "second object" that are "mechanically related" to each other.

In contrast, the '839 patent claims never discuss "mechanically related" objects; they instead all

describe and claim inventions involving an "object" and a "support structure."

## III.   ARGUMENT

### A.   "Fabricating an Interface Layer"

| Desktop Metal | Markforged |
|---|---|
| Plain meaning | "fabricating a discrete layer of material between a support structure and an object that provides a non-sintering barrier between the two in subsequent processing, wherein the discrete layer does not overlap with other layers" |

---

[6] The abstract provides useful intrinsic evidence for claim construction.  *Hill-Rom Co., Inc. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 & n.1 (Fed. Cir. 2000).

The term "fabricating an interface layer" appears in every claim of the '839 patent.  It is explicitly defined in the patent, and "[w]hen a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls."  *Martek Biosciences Corp.*, 579 F.3d at 1380.

The '839 patent states:

> As shown in step 804, the method 800 may include forming an interface layer on a surface of the support structure. This may, for example, include fabricating a discrete layer of material that provides the interface layer, or this may include modifying or augmenting the fabrication process to form an interface layer within or adjacent to the support structure, the object, or both. ***Thus, as used herein, references to "fabricating an interface layer" are intended to refer to a step of fabricating a discrete layer of material between a support structure and an object that provides a non-sintering barrier between the two in subsequent processing***.

'839 at 44:6-29 (emphasis added).[7]  There can be no doubt this is an explicit definition of a unitary term.  The words "as used herein" signal that the patentee is defining the term that follows.  *Abbott Labs. v. Andrx Pharms, Inc.*, 473 F. 3d 1196, 1210 (Fed. Cir. 2007).[8]

Were there any doubt, the specification goes on to contrast "fabricating an interface layer" with a different and more broadly defined term, "forming an interface layer":  "***[t]he phrase 'forming an interface layer,' as used herein, is intended to refer <u>more broadly</u> to any technique for forming a material system that resists bonding of the support structure to the object through the interface layer during sintering.***"  '839 at 44:22–25 (emphasis added).  The '839 patent is clear: "forming an interface layer" is "broad[er]" than the narrower step of "fabricating an interface layer."[9]

---

[7] The specification places the entire phrase "fabricating an interface layer" in quotes, showing the phrase is one term – not "fabricating" and "interface layer" as separate terms.

[8] *See, e.g., Infinity Headwear & Apparel, LLC v. Jay Franco & Sons, Inc.*, No. 15-CV-1259 (JPO), 2016 WL 5372843, at *9 (S.D.N.Y. Sept. 26, 2016) ("'[a]s used herein,' as well as setting off the term-at-issue in quotation marks, clearly indicates an intent by the drafter to provide a particular definition of the term 'blanket' that is contrary to its plain and ordinary meaning").

[9] The patent distinguishes these separate embodiments: Fig. 8 and Fig. 9 are identical flow diagrams, except Fig. 8 describes "Form Interface Layer" while Fig. 9 describes "Fabricate

We therefore know from the specification that a "fabricated" interface layer must have several qualities:  (1) it must be a "discrete layer of material between a support structure and an object," and (2) it must provide "a non-sintering barrier" between the support and the object during subsequent processing.  In contrast, the patent makes clear that a "formed" interface layer need not be "discrete," since "forming an interface layer may include … *other techniques that do not involve the fabrication of a discrete material layer*."  '839 at 44:36-40.

One question remains:  what does it mean for a layer to be "discrete"?  The patent answers that question.  A "discrete" layer is distinct from, and does not overlap with, the object or the support structure.[10]  Column 40 describes two different embodiments of the interface layer:

1. In "one aspect" shown in Fig. 7, the "interface layer 706 physically excludes the adjacent support structure 704 and object 702 forming a *physically separate barrier* between the two" ('839 at 40:48-50).

2. In "another aspect" the "interface layer 706 may be formed "between and/or within a surface of the object 702, and adjacent surface of the support structure 704, or both" (id. 40:57-59, 41:3-7).

Thus, "aspect" #1 requires a physical "barrier" that separates the object and the support, which is consistent with the specification's definition of "fabricating an interface layer."  In contrast, "aspect" #2 permits the interface layer to be formed "between *and/or within*" the object and the

---

Interface Layer."  Tellingly, Desktop Metal separately claimed these two embodiments in two parallel applications submitted the same day.  Ex. F compares the '839 patent, entitled "*Fabricating* An Interface Layer For Removable Support," with Desktop Metal's separate U.S. Patent App. No. 15/469,213, entitled "*Forming* An Interface Layer For Removable Support."  The "fabricating" embodiment resulted in the '839 patent.  The broader "forming" embodiment was rejected over prior art.  *See* Ex. G.  Having failed to obtain claims on the "forming an interface layer" concept, and only having obtained claims on the narrower "fabricating an interface layer" concept, Desktop Metal cannot now collapse the distinction between the two for litigation convenience.  *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers.").

[10] This is consistent with the plain English meaning of "discrete."  *See* Ex. H (Merriam Webster) (defining "discrete" as "consisting of distinct or unconnected elements: noncontinuous").

support structure which is consistent with the broader (and unpatentable) "forming an interface layer" set of embodiments.  Figure 7 is referenced as illustrative of both "aspects," but the patent makes absolutely clear that it only accurately depicts "aspect" #1, where the interface layer (706) is a discrete "physically separate barrier" and that layer does not overlap *with* the support (704), the object (702), or the bottom surface of the object (708), as described (*see* '839 at 40:47-41:8):



Fig. 7.  When the specification goes on to describe aspect #2, ***where, unlikely aspect #1,  the interface layer is permitted either to be between or within the surfaces of either the object or the support structure***, the patent states that Figure 7 may not accurately depict that configuration: "while illustrated as a ***discrete*** layer, it will be understood that the interface layer 706 may overlap with the support structure 704 and/or the object 702…" '839 at 40:67-41:2.

This distinction is instructive.  First, and most importantly, it shows that Figure 7 depicts a "discrete layer," the type of layer explicitly associated with the claim term "fabricating an interface layer."  And Figure 7 shows a "discrete" layer is distinct from and does not overlap with the layers above and below.  Second, there would be no need to say that "*while* [Figure 7 is] illustrated as a discrete layer," the interface layer [in aspect #2] still "may overlap" with the support and/or object if a "discrete" layer could overlap with the support or object.  The negative implication (as well as the picture) is clear; a "discrete" layer does not "overlap."  Markforged thus proposes to add this

phrase to the construction – "wherein the discrete layer does not overlap with other layers" – to reflect the plain meaning of "discrete" and the patent's use of that word.[11]

Desktop Metal urges that the Court give "fabricating an interface layer" its alleged "ordinary and plain meaning."   But this fails for two reasons.  *First*, the specification defines the term and that definition controls.  *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.,* 493 F.3d 1358, 1361 (Fed. Cir. 2007) ("When a patentee defines a claim term, the patentee's definition governs, even if it is contrary to the conventional meaning of the term.")  *Second*, Desktop Metal breaks "fabricating an interface layer" into "fabricating" and "interface layer" (two terms) to avoid the patent's definition of a defined unitary term.  Desktop Metal argues "fabricating" simply means "making, creating, or manufacturing" based on dictionaries.  (Ex. E, Gall ¶ 117.)  But this improperly collapses the "fabricating" and "forming" distinction explicitly set forth in the specification; using dictionaries, both simply would mean "to make" the interface layer.  *Compare* Ex. I (dictionary definition for "fabricating" is "to make, create") with Ex. J (dictionary definition for "forming" is "to make or fashion by shaping").  The patent's definition makes far more sense, ***in the context of the patent***, than Desktop Metal's purported "ordinary meaning."

B.   <u>"Interface Layer"</u>

| Desktop Metal | Markforged |
|---|---|
| Plain meaning | "layer engineered to resist the formation of mechanical bonds between objects and supports or objects and objects, by preventing build material from sintering across the interface layer" |

Every claim of the '839 requires "fabricating an interface layer," and therefore clarifies the type of interface layer required by those claims; thus, the term "interface layer" is only of concern

---

[11] Given the plain meaning of "discrete" (Ex. H), it would suffice for the Court to adopt the exact definition of "fabricating an interface layer" set forth in the specification, without any addition.  But Markforged suggests that adding this additional language would benefit the jury and ensure the word "discrete" is applied consistently with its use in the patent.

to the '118 patent.  Markforged's proposed construction mirrors the patent's description of how interface layers work.  *See* '118 at 5:61-64 ("where an infiltrable build material is used, the corresponding interface layer should be engineered to resist any infiltration that might result in the formation of a mechanical bond across the barrier created by the interface layer"); *id.* at 39:40-43 ("the use of the interface layer 706 prevents the build material from sintering across the interface layer").  Desktop Metal's only proposal is "a layer at an interface"[12] – essentially a passive voice restatement of the term itself that amounts to no construction at all.

C.     "Sintering"

| Desktop Metal | Markforged |
|---|---|
| Plain meaning | "a sintering and infiltration process in which pores of a partially sintered part are filled, e.g., through contact and capillary action, with some other material to increase hardness, increase tensile strength, or otherwise alter or improve properties of a final part" |

The term "sintering" appears in every independent claim of the '839 and '118 patents. Markforged's proposed construction reflects the express definition of the term by the patentee, acting as his own lexicographer.  Desktop Metal's "plain meaning" seeks impermissibly to ignore that definition and erase that lexicography.

The patents recognize "sintering may usefully include different types of sintering." '839 at 5:41-43.  But the specification then explicitly states that "sintering," as used in the claims, to refer to a specific form of sintering: "***any references herein*** to sintering should be understood to contemplate ***sintering and infiltration*** unless a different meaning is expressly stated or otherwise clear from the context."  *Id.* at 5:51-54 (emphasis added).  This lexicography could not be any clearer.  It plainly informs the public that "any references" to sintering require "sintering and

---

[12] *See* Ex. E (Gall ¶ 233) (claiming "the customary meaning a person of ordinary skill would attribute to the term 'interface layer'" is "a layer at an interface").

infiltration."  If the patentee merely wanted to *allow* for the addition of infiltration there was no need for this definition.  The word "sintering" alone would have permitted additional processes in a "comprising" claim.  The patentee could also have said sintering *may* be done alone or with infiltration.  But that is not what the patentee said.  The patentee chose to *define* sintering as sintering *and* infiltration.  *Id.*  Markforged's proposal adopts this exact language.  It therefore is the legally appropriate construction.  *Martek Biosciences*, 579 F.3d at 1380.[13]

Desktop Metal asserts that "sintering" should have its "plain meaning" because Desktop Metal would now prefer the claim to cover sintering alone – without infiltration.  But if Desktop Metal wanted sintering to have its "plain meaning," it should not have explicitly defined "sintering" in an idiosyncratic way in its patent specifications.  The patents' definition is express: "***any references herein*** to sintering should be understood to contemplate sintering ***and infiltration*** unless a different meaning is expressly stated or otherwise clear from the context."  *Id.* at 5:51-54.  The patent's definition plainly is a defined "meaning" of sintering – otherwise the patent's subsequent reference to "unless a different meaning is expressly stated" would make no sense.  The patentee knew sintering without infiltration was possible (*id.* at 5:41-50), but nonetheless decided to define sintering "herein" as "sintering and infiltration," rather than some other process.

Desktop Metal cannot rely on "plain meaning" to undo the patent's express definition to the contrary.  *See Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1332, 1329 (Fed. Cir. 2009) ("we will adopt a definition that is different from the ordinary meaning when the patentee acted as his own lexicographer"; holding "graft" should be narrowly understood as "intraluminal graft,"

---

[13] This is especially true given the use of "contemplates" to define the term – a clear sign of lexicography.  *See Jack Guttman Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1359 (Fed. Cir. 2002) (amendment adding term "non-tortuous copy path" stated term "contemplates a curved copy path … that is free from tortuous bends"; holding that "definition espoused by the applicant" controlled for claim construction).

rather than any other type of graft, where specification "consistently uses the words 'graft' and 'intraluminal graft' interchangeably," and "interchangeable use of the two terms is akin to a definition equating the two").  The definitions in the specification control over typical meaning. *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.,* 493 F.3d 1358, 1361 (Fed. Cir. 2007)

D.      "Resists Bonding"

| Desktop Metal | Markforged |
| --- | --- |
| Plain meaning | "prevents the build material from sintering across the interface layer" |

All asserted claims require the interface layer to "resists bonding."  In the '118 the layer "resists bonding" "of the first surface to the second surface," and in the '839, it "resists bonding" of "the support structure to the object."  In both instances "the interface layer 706 prevents the build material from sintering across the interface layer."  '118 at 39:40-43; '839 at 39:40-43.

Desktop Metal offers an entirely subjective test, citing dictionaries defining "resist" as "*try to prevent by action or argument*," or as "[t]o *strive* to fend off or offset the actions, effects, or force of."  Ex. E (Gall ¶ 153).  This both makes no sense and offers no objective boundary to determine whether an "interface layer" "tried hard enough" to qualify as "resisting."  Without that objective standard, the claim is indefinite.  *Nautilus*, 134 S. Ct. at 2129 (claims indefinite if they "fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention").  The claims "must provide **objective boundaries** for those of skill in the art" that cannot depend "on the unpredictable vagaries of any one person's opinion."  *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (phrase "unobtrusive manner that does not distract a user" was indefinite); *see also In re Walter*, 698 Fed. App'x 1022, 1026 (Fed. Cir. 2017) ("block-like" was an indefinite term of degree with no objective boundary).

The Federal Circuit's treatment of a comparable term, "fragile gel," is instructive.  "Fragile" has a plain English meaning, like "resist."  But the Federal Circuit held "fragile gel" was

indefinite under 35 U.S.C. § 112 where the patent offered no objective way to determine if a particular gel was sufficiently "fragile." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1246, 1256 (Fed. Cir. 2008) ("[e]ven if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope"; term "fragile gel" was "indefinite because it is ambiguous as to the requisite degree of the fragileness of the gel").

The asserted patents provide no more objective guidance on the requisite degree of "resistance" to bonding that qualifies.  Nor do they indicate how much resultant bonding is allowed.  All we know is the layer must "resist" bonding.  Desktop Metal's expert draws an analogy to "resisting" arrest and notes the person resisting still is ultimately arrested.  Ex. E (Gall ¶ 153.)  But this compounds rather than solves the ambiguity; under that interpretation, an interface layer still "resists" bonding *even if the object and support become bonded* – making it harder still to tell in any objective manner whether the interface layer "resisted" bonding in some way. Desktop Metal's proposal, "try to prevent," fails to give the public fair notice how much the interface layer must "try" before this limitation is met.[14]  Indeed, Desktop Metal offers no objective

---

[14] Desktop Metal's expert also claims "People understand the difference between waterproof and water-resistant, and they do not struggle to understand the bounds of the latter." Ex. E (Gall ¶ 49 n.2).  Not so.  "Water resistant" is notoriously confusing. Ex. K ("Do you know the difference between waterproof vs water-repellent vs water-resistant outerwear? … If you took a poll, you would find that most people often confuse these topics.").

Indeed, courts have held claims indefinite where terms were analogized to "waterproof" or "water resistant."  *See, e.g., Aquatic AV Inc. v. Magnadyne Corp.*, No. 14-cv-01931-WHA, 2015 WL 926425 at *2-*3 (N.D. Cal. Feb. 25, 2015) (claim indefinite where patentee attempted to construe "hermetically seals" as "waterproof" or "water resistant" or "watertight," and when patentee tried, after the fact, to use an undisclosed objective standard, "IPX6," to specify a *degree* of water resistance; the Court noted  "applicants face powerful incentives to inject ambiguity into their claims" and "sometimes intentionally select elastic language," but "[i]f the applicant intended to refer to the IP Codes [the alleged objective standard on the claimed degree of water resistance], he should have stated it.  It is now too late to try to fix it up during litigation, years later.").

proof that its own standard is met, instead relying on its expert's subjective belief that the accused

supports "can *easily* be removed" from finished parts. Ex. E (Gall ¶ 250).[15]   But how easy is

"easily?"  And "easy" from whose perspective?  The public is left to guess, which is impermissible.

*Nautilus*, 134 S. Ct. at 2129 (claims must "be precise enough to afford clear notice of what is

claimed, thereby apprising the public of what is still open to them").

### E.   "Support Structure"

| Desktop Metal | Markforged |
|---|---|
| Plain meaning | "structure providing support for a portion of an object in certain fabrication processes" |

A "support structure," as it is used in the context of the '839 patent, means a "structure

providing support for a portion of an object in certain fabrication processes."  As the patent admits,

support structures have been used for years in additive manufacturing.  '839, Abstract.  The support

is not an object; it is a structure *supporting* an object.  The figures repeatedly distinguish between

an "object" (final part) and a "support" (the structure supporting the final part).[16]  The specification

---

[15] The named inventors echoed the litigation expert, offering only subjective boundaries. Ex. L (Yet-Ming Chiang Dep. Tr. at 14:22-15:7) ("So our invention in this case involves . . . those bonds are weak enough that one can *easily* separate the part from the underlying support.  So that is the general invention."); *id*. 25:21-23 (if "you cannot *easily* separate" the part and the support, "that's not the purpose of our invention, as I explained"); Ex. M (Michael Gibson Dep. Tr. 117:20-22) (resist bonding is "all a matter of degree"); *id*. 128:6-129:20 ("resists bonding" is "application specific" and "context dependent"; inventor could not "comment about the general boundaries").

[16] For example, the '839 Abstract states: "*Support structures* are used in certain additive fabrication processes to permit fabrication of a greater range of *object* geometries. . . . [A]n interface layer is fabricated between the *object* and *support* in order to inhibit bonding between adjacent surfaces of the *support structure* and the *object* during sintering."  The specification likewise states that "*[s]upport structures* are commonly used in additive manufacturing to expand the features available in fabricated *object*, e.g., by providing underlying structural support for overhangs or lengthy bridges of otherwise unsupported material."  '839 patent at 1:37-41; *see also id*. at 1:46, 1:47 (referring to the "supported object").  The Summary says the same.  *Id*. at 1:55-56.  *See also* Fig. 8 (separately listing "Fabricate Support Structure 802" and "Fabricate Object 806"); Fig. 9 (same, "Fabricate Object 902" and "Fabricate Support Structure 906"); Fig. 13 (same, "Provide Support Structure 1306" and "Fabricate Object 1312"); Fig. 14 ("Fabricate Support Structure 1404" and "Fabricate Object 1406").

repeatedly and consistently refers to a "support" to identify the support, and an "object" to identify the final part that the support structure supports. These repeated uses define the terms. *See Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) ("The specification acts as a dictionary when it expressly defines terms used in the claims *or when it defines terms by implication*.") (emphasis added).

Desktop Metal's expert says "support structure" needs no construction, but then gives a construction: "a structure that provides support to an object." Ex. E (Gall ¶¶ 167-68). This is very similar to Markforged's own construction, and disputes only four words – "in certain fabrication processes." But those words mirror the '839 Abstract. Regardless, there is no dispute that the support structure provides support to an object.

F.      "Object" / "First Object" / "Second Object"

| Desktop Metal | Markforged |
|---|---|
| Plain meaning | "structure to be processed into a final part" |

The term "object" is essentially only disputed for the '118 patent—specifically, whether the claimed "first object" and "second object" refer to final parts, or instead could be support structures. The patent provides a clear answer: "object" repeatedly and consistently is used in the '118 patent to mean a "structure to be processed into a final part," and not to refer to a "support." The patent refers to "processing of the first object into a final part," '118 at 1:64; "densify[ing] the object into a final part," *id.* at 6:28–29; "processing of the object into the final part," *id.* at 8:20–21; and over a dozen other similar references.[17]   The '118 is entitled "Fabricating Multi-Part Assemblies," and Figure 15, a "flow chart of a method for fabricating multi-part assemblies" ('118

---

[17] See *id.* at 26:53 ("processing of the object into a final part"), 38:50–51 ("processing of the object 702 into the final part"), 50:25 ("sintering the object to provide a final part"); *see also id.* at 50:56–57, 53:59–62, 55:3–7, 59:32, 59:44, 62:1–2 (same).

at 3:32-33), confirms that the "first object" and the "second object" are "finish[ed]" into final parts – it refers to "Finish Object**s**" (plural) at step 1518:



Fig. 15

The rest of the specification accords.  *See* '118 at 1:64 ("processing of the first object into a final part"), 3:34 ("processing of the second object into a second final part").  This clear, repeated usage of "object" as something that becomes a "final part" is controlling; it provides an implicit definition of the term, and that implicit definition controls.[18]

Desktop Metal offers no construction at all for "object."  Its expert merely says "object" is broad enough to cover "support structure" – a separate claim term.  Ex. E (Gall ¶ 181) ("a support structure is an object, and it does not cease to be an object because it provides support for another object").  That is not a construction.  Desktop Metal appears to be saying anything and everything recited in the claim (like the interface layer)  is an "object."  This is of course not how the claims read, and not how "object" is used in the specification.  Desktop Metal's plainly incorrect reading of "object" as "anything" should be rejected in light of (1) the patent's consistent and repeated use of "object" as the final part, and (2) the consistent distinction between "object" and "support."

Desktop Metal's entire argument relies on one sentence in the 68 columns of the patent: "The materials of the first object and the second object, e.g., an object and a support for the object, or an object and a complementary mechanical part such as a mating gear, may have generally

---

[18] *See Saffran v. Johnson & Johnson*, 712 F.3d 549, 560 (Fed. Cir. 2013) ("[e]xtensive, consistent usage in the specification" defines the term); *Bell Atl.*, 262 F.3d at 1271 (construing claim to reflect consistent usage of claim term in specification); *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1360 (Fed. Cir. 2005) (same).

complementary properties." *Id*. (quoting '118 at 57:44–47)). But the very next sentence confirms that a support and an object are different: "The first material (of the support) and the second material (of the object) may be supplied from a single source of build material." '118 at 57:47-50. And the patent's discussion of Figure 15 makes clear that where a support is used, the support is used *in addition to* – not as one of – the first and second objects of the multi-part assembly: if a multi-part assembly "requires internal print support, sinter support or the like," a "support material" is used, with "a physical exit path within the multi-part mechanical assembly for extraction of a support material." *Id.* at 57:66–58:5–7. This makes intuitive sense; if the "first object" and "second object" were not both parts, there could be ***only one part*** – contrary to the claimed invention (and title) of the '118 patent: "Fabricating ***Multi-Part*** Assemblies." Desktop Metal's proposal flatly contradicts the nature of the alleged invention and should therefore be rejected.[19] In any event, the lone sentence Desktop Metal relies on cannot (and does not purport to) change the clear distinction between "object" and "support" as used dozens of times in both patents. *See Trs. of Columbia Univ. v. Symantec*, 811 F.3d 1359, 1366 (Fed. Cir. 2016) ("This single sentence in the specification cannot overcome the overwhelming evidence in other parts of the specification …. The patentee cannot rely on its own use of inconsistent and confusing language in the specification to support a broad claim construction which is otherwise foreclosed.").

G.      "Mechanically Related To"

| Desktop Metal | Markforged |
|---|---|
| Plain meaning | "physically interrelated parts that can be used to form a mechanical assembly" |

---

[19] *Netword*, 242 F.3d at 1352 (claims must be interpreted to reflect "the invention that is described in the specification; they do not have meaning removed from the context from which they arose").

Every asserted claim of the '118 patent requires that "the second object is structurally independent from and mechanically related to the first object."  The '118 patent makes clear that "related" parts are parts that work together when assembled, such as gears and hinges:

> More generally, the capability to print adjacent, non-coupled parts may be used to fabricate multiple physically **related parts** in a single print job. This may, for example, include hinges, gears, captive bearings, or other nested or **interrelated parts**.

'118 at 56:31-34.  This is consistent with the stated purpose of the '118 patent:  to create "multi-part assemblies."  *See Id*., Abstract.  The specification goes on to confirm this reading:

> The first object and the second object may be **mechanically or structurally related** in a number of different ways. For example, the first object and the second object may form a multi-part mechanical assembly such as a hinge, a gear set, a bearing, a clamp, and so forth. For example, the first object and the second object may include complementary gears, or one of the first object and the second object may include an axel or a bearing. The multi-part assembly may also include one or more parts moving within a casing.

*Id*. at 57:56-64.  These are the only discussions of "mechanically related" parts – there is **no** use in the patent of "mechanically related to" for anything other than such a relationship.

Desktop Metal argues that "mechanically related to" needs no construction and can be readily understood by its "ordinary and customary meaning," but fails to provide any such "meaning."  Its expert states only that this meaning would "encompass objects that provide support for other objects."   (Gall ¶ 193).  Desktop Metal's repeated resort to what it contends a term "encompass[es]" is nothing more than a results-oriented desire to cover a particular design, not a construction.  Regardless, Dr. Gall cites nothing to back up this vague assertion.  The only language from the patent he relies upon (*id*. ¶ 192) conspicuously does **not** use the phrase "mechanically related to," and instead refers to "mechanical coupling," '118 patent at 29:64-67, or "mechanical support," *id*. at 39:28-31.  There is no textual or logical basis to interpret these different phrases to define the separate phrase "mechanically related to," particularly when the patent specifically and separately addresses the phrase "mechanically related to."  Claims 1 and 24 require that the first

object and second object must be "mechanically related," but do not mention "mechanical coupling" or "mechanical support" anywhere in the claims. *Id.* at 65:65–66:16 & 67:12–33. Nor should they; the context of "mechanical coupling" and "mechanical support" is entirely different. "Mechanically related" refers to the relationship between the first and second object; "mechanical coupling" and "mechanical support" are used without any reference to the first and second object, because they concern a ***single*** object, made using supports.

Desktop Metal fails to reconcile the conflict between its theory and the fundamental invention claimed by the '118 patent. Support structures in the patents are sacrificial; they do not become parts. The idea that a support structure is "mechanically related to" a part because the part rests on the support would mean that there only is one final part, despite the fact that the '118 patent purports to describe creation of a "***multi-part*** assembly." Desktop Metal's reading departs wildly from all the examples of "mechanically related to" in the specification, each of which concern two parts that interact as part of a physical mechanism. When the '118 patent discusses the use of supports, it never discusses that as a "mechanical relationship," because it is not such a relationship—not in the patent, and not in plain English. It would be error to adopt such a construction for "mechanically related" here. *See Saffran*, 712 F.3d at 560 (reversing district court's broad construction of "device" where "[e]xtensive, consistent usage in the specification" indicated a narrower reading of "device," and that narrower understanding "most naturally aligns with the patent's description of the invention").

Finally, Desktop Metal argues Markforged's construction fails to differentiate claims 1 and 4 of the '118 patent. This argument is meritless. Claim 4 covers formation of an *assembled* multi-part mechanical assembly. See Fig. 16. Claim 1 more broadly covers the creation of mechanically-related parts whether already assembled or not (*e.g.*, two gears with interlocking teeth that are

printed together not yet assembled).  The patent discloses "concurrent fabrication" and "separate manufacture and assembly" embodiments.  '118 at 57:35-39 ("while the method 1500 described herein generally contemplates *concurrent* fabrication of interrelated mechanical assemblies, this may also or instead include *separate manufacture and assembly* of parts as described above") (emphases added).  Claims 1 and 4 separately claim those two embodiments.

H.    "Structurally Independent From"

| Desktop Metal | Markforged |
|---|---|
| Plain meaning | "physically separated from" |

All asserted claims of the '118 patent require that the "first object" and "second object" are "structurally independent from" each other.  Markforged proposes to construe "structurally independent from" as "physically separated from," consistent with the term's use in the '118 patent and the term's plain English meaning.  Two "structurally independent" objects must be physically separated; two objects cannot be structurally connected and still be "structurally independent."

The patent confirms this important conclusion.  The '118 patent states that "to maintain at least partial mechanical *independence*" in a multi-part mechanical assembly, "individual components of the mechanical assembly . . . may . . . b[e] *physically separated using an interface layer*."  '118 patent 58:40-42 (emphases added).  Thus, the patent explicitly recognizes physical separation achieves "independence" between two objects, particularly in the context of mechanical assemblies which are the focus of the '118 patent.  *See id.* at 58:25-52 & Fig. 16.

Desktop Metal offers shifting constructions of "structurally independent from," all supposedly representing the term's "ordinary and customary" meaning.  Its infringement contentions contend an object is "structurally independent from" another object if it "can be removed from" the other object, even if both objects are attached.  Ex. N (Inf. Contentions, Appx.

A at 8).  But many structurally connected objects "can be removed" from one another.  A finger can be removed from a hand, but is not "structurally independent from" the hand.

Desktop Metal's expert tries to move away from the unworkable definition of structurally independent in Desktop Metal's infringement contentions by proposing that "structurally independent" can "encompass" "objects that are connected via weak mechanical coupling/structure such that removal of one object from the other is facilitated."  Ex. E (Gall ¶ 187).  Arguing that a term can "encompass" something is not a construction; it simply is a desire to cover something, without defining the bounds of the claim.   Regardless, the patent does not say "weakly structurally dependent"—it says "structurally independent."  And when the patent uses "independent" it says "independent" parts are *physically separated* using an interface layer." '118 at 58:39-43.   Dictionaries likewise do not define "independent" as "weakly dependent"— they define "independent" as "not connected with another or with each other; separate."  Ex. J. Notably, the one circumstance that Dr. Gall and Desktop Metal completely ignore when "defining" "structurally independent" is where the first object and second object are not physically connected. Desktop Metal's proposal is inconsistent with the patent, with plain English, and with Patent Act's requirement to provide fair notice.[20]

## IV.   CONCLUSION

For the foregoing reasons, the Court should adopt Markforged's proposed constructions.

---

[20] Desktop Metal's proposal also begs the question, how "weak" a bond is sufficiently "weak" to satisfy the term?  How "facile" a removal "facilitates" removal?  These terms of degree raise serious indefiniteness issues, like the term "fragile" before them.  *Cf. Halliburton*, 514 F.3d at 1256 ("fragile gel" indefinite "because it is ambiguous as to the requisite degree of the fragileness of the gel").

Dated: June 19, 2018

/s/ *Steven Cherny*
Harvey J. Wolkoff (BBO# 532880)
Patrick D. Curran (BBO# 568701)
Aliki Sofis (BBO# 675777)
Kaitlyn M. O'Connor (BBO# 687527)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, MA 02199
Tel: (617) 712-7100
harveywolkoff@quinnemanuel.com
patrickcurran@quinnemanuel.com
alikisofis@quinnemanuel.com
kaitoconnor@quinnemanuel.com

Steven Cherny (*pro hac vice*)
James Baker (*pro hac vice*)
Elinor Sutton (*pro hac vice*)
Jeremy Baldoni (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel: (212) 849-7000
stevencherny@quinnemanuel.com
jamesbaker@quinnemanuel.com
elinorsutton@quinnemanuel.com
jeremybaldoni@quinnemanuel.com

*Attorneys for Markforged, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon attorneys of record on June 19, 2018.

/s/ *Aliki Sofis*

## APPENDIX A: Asserted Claim Language

Desktop Metal accuses Markforged of infringing claims 1-4, 10-14, 17, and 24 of the

'118 patent, and claims 1-3, 5, 10, 16-18, 20-21, and 23 of the '839 patent.  There are three

independent claims at issue:  Claims 1 and 24 of the '118 patent, and Claim 1 of the '839 patent.

These three independent claims are reproduced below with terms at issue in bold:

'118 Patent, Claim 1:

1. A method comprising:

fabricating a first **object** from a first material, wherein the first material includes a powdered material and a binder system, the binder system including one or more binders that resist deformation of a net shape of the first **object** during processing of the first **object** into a final part;

applying an **interface layer** adjacent to a first surface of the first **object**; and

fabricating a second surface of a second **object** from a second material at a location adjacent to the **interface layer** and opposing the first surface of the first **object**, wherein the second **object** is **structurally independent from** and **mechanically related to** the first **object**, wherein the **interface layer resists bonding** of the first surface to the second surface during **sintering**, and wherein the **interface layer** reduces to a powder during **sintering** of the first material.

'118 Patent, Claim 24:

24. A method comprising:

receiving an article including a first **object** from a first material, wherein the first material includes a powdered material and a binder system, the binder system including one or more binders that resist deformation of a net shape of the first material during processing of the first material into a final part, the article further including an **interface layer** adjacent to a first surface of the first **object**, and the article further including a second surface of a second **object** from a second material at a location adjacent to the **interface layer** and opposing the first surface of the first **object**, wherein the second **object** is **structurally independent from** and **mechanically related to** the first **object**, and wherein the **interface layer resists bonding** of the first surface to the second surface during **sintering**; and

processing the article to form the **object** into a final part based on the first **object** and the second **object**, wherein processing includes at least one of debinding the article and **sintering** the article, and wherein the **interface layer** reduces to a powder during **sintering** of the first material.

'839 Patent, Claim 1:

1. A method comprising:

fabricating, from a first material, a **support structure** for an **object**;

**fabricating an interface layer** adjacent to the **support structure**; and

fabricating a surface of the **object** from a second material, the surface of the **object** adjacent to the **interface layer** and the second material including a powdered material for forming a final part and a binder system including one or more binders, wherein the one or more binders retain a net shape of the **object** during processing of the **object** into the final part, wherein processing of the **object** into the final part includes debinding the net shape to remove at least a portion of the one or more binders and **sintering** the net shape to join and densify the powdered material, and wherein the **interface layer resists bonding** of the support structure to the object during **sintering**.